# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 9, 2019                    Decided July 17, 2020

No. 19-5013

GRACE, ET AL.,
APPELLEES

v.

WILLIAM P. BARR, ATTORNEY GENERAL OF THE UNITED
STATES, IN HIS OFFICIAL CAPACITY, ET AL.,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-01853)

———

*Erez Reuveni*, Assistant Director, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Susan Bennett Green*, Senior Litigation Counsel, and *Christina P. Greer*, Trial Attorney.

*Michael M. Hethmon* was on the brief for *amicus curiae* Immigration Reform Law Institute in support of defendants-appellants.

*Cody Wofsy* argued the cause for appellees. With him on the brief were *Jennifer Chang Newell*, *Katrina Eiland*, *Julie Veroff*, *Judy Rabinovitz*, *Omar C. Jadwat*, *Celso J. Perez*, *Eunice Lee*, *Karen Musalo*, *Anne Dutton*, *Blaine Bookey*,

*Sandra S. Park*, *Scott Michelman*, *Arthur B. Spitzer*, and *Thomas Buser-Clancy*.

*Karl A. Racine*, Attorney General, Office of the Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, *Caroline S. Van Zile*, Deputy Solicitor General, and *Lewis T. Preston*, Assistant Attorney General, were on the brief for *amici curiae* The District of Columbia, et al. in support of appellees.

*Elizabeth B. Wydra*, *Brianne J. Gorod*, and *Brian R. Frazelle* were on the brief for *amici curiae* Current Members of Congress and Bipartisan Former Members of Congress in support of plaintiffs-appellees.

*Paul M. Thompson*, *Julie Carpenter*, and *Richard Caldarone* were on the brief for *amici curiae* The Tahirih Justice Center, et al. in support of appellees and affirmance.

*Derek T. Ho* was on the brief for *amici curiae* Administrative Law Professors in support of plaintiffs-appellees.

*Thomas K. Ragland* was on the brief for *amici curiae* Immigration Law Professors in support of plaintiffs-appellees.

*Alexander J. Kasner* was on the brief for *amicus curiae* United Nations High Commissioner for Refugees in support of plaintiffs-appellees.

Before: HENDERSON, TATEL, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Dissenting opinion filed by *Circuit Judge* HENDERSON.

TATEL, *Circuit Judge*: Twelve asylum seekers challenge a host of executive-branch policies adopted to implement the expedited-removal provisions of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009-546 (codified as amended in scattered sections of 8 U.S.C.). Broadly speaking, the challenged policies concern how asylum officers determine whether an alien has demonstrated a "credible fear" of persecution, a threshold showing that permits an alien who would otherwise be immediately deported to seek asylum in the United States. The asylum seekers principally argue that the policies raise the bar for demonstrating a credible fear of persecution far above what Congress intended and that the Attorney General and various agencies violated the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 et seq., by failing to adequately address important factors bearing on the policies' adoption. Largely on these grounds, the district court found the policies inconsistent with IIRIRA, the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1101 et seq., and the APA, and enjoined their enforcement. For the reasons set forth in this opinion, we affirm in part and reverse in part.

## I.

In IIRIRA, Congress established a comprehensive scheme for distinguishing between aliens with potentially valid asylum claims and those "'who indisputably have no authorization to be admitted [to the United States].'" *American Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1355 (D.C. Cir. 2000) (quoting H.R. Rep. 104-828, 209 (1996) (Conf. Rep.)). Under IIRIRA, which amended the INA, newly-arrived aliens who lack valid authorization to enter the United States but express an "intention to apply for asylum," or indicate to immigration

officers that they "fear persecution" if returned to their home countries, must be interviewed by trained asylum officers. 8 U.S.C. § 1225(b)(1)(A)(i)–(ii), (b)(1)(E). Such officers are employees of the United States Citizenship and Immigration Service (USCIS), an agency of the Department of Homeland Security (DHS). Asylum officers determine, in a "nonadversarial" interview, whether an alien's "fear of persecution" is "credible." 8 C.F.R. § 208.30(d)–(e).

The stakes are high. An alien found to have a credible fear of persecution receives a full-blown asylum hearing before an immigration judge, an employee of the Department of Justice (DOJ), and has a right to review by the Board of Immigration Appeals—also housed within DOJ—and then the appropriate circuit court of appeals. *See DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1965 (2020) ("If the asylum officer finds an applicant's asserted fear to be credible, the applicant will receive 'full consideration' of his asylum claim in a standard removal hearing." (quoting 8 C.F.R. § 208.30(f))); *see also* 8 U.S.C. § 1225(b)(1)(B)(ii). An alien who receives a negative credible-fear determination may also seek review by an immigration judge, but if that judge affirms the negative finding, then "the asylum officer shall order the alien removed from the United States without further hearing or review." 8 U.S.C. § 1225(b)(1)(B)(iii)(I), (III); *see also* 8 C.F.R. § 1208.30(g). Aliens removed through this "highly expedited" process, which "is meant to conclude within 24 hours," *Make the Road New York v. Wolf*, No. 19-5298, 2020 WL 3421904, at *2 (June 23, 2020), are ineligible for admission to the United States for a period of five years, 8 U.S.C. § 1182(a)(9)(A)(i).

This case concerns the credible-fear interview. At this "screening" stage, "[t]he applicant need not show that he or she *is in fact eligible* for asylum." *Thuraissigiam*, 140 S. Ct. at 1965. Instead, IIRIRA defines "[c]redible fear of persecution"

as "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under [8 U.S.C.] section 1158." 8 U.S.C. § 1225(b)(1)(B)(v). Under section 1158, an alien must demonstrate two things: first, "refugee" status, *id.* § 1158(b)(1)(B)(i), that is, either past persecution, or a "well-founded fear" of future persecution, "on account of" one or more of five statutorily-provided grounds—"race, religion, nationality, membership in a particular social group, or political opinion," *id.* § 1101(a)(42)(A); and second, that the ground "was or will be at least one central reason" for the persecution, *id.* § 1158(b)(1)(B)(i). Put differently, to gain asylum, the alien must prove that the alleged harm has a nexus to one of the enumerated grounds—in this case, "membership in a particular social group."

The INA nowhere defines "particular social group." But in a line of decisions beginning with *Matter of Acosta*, 19 I. & N. Dec. 211 (BIA 1985), the Board has long defined the term to mean "a group of persons all of whom share a common, immutable characteristic," one they "either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Id.* at 233; *see also Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 230–31 (BIA 2014) (same); *In re Kasinga*, 21 I. & N. Dec. 357, 366 (BIA 1996) (same). This basic definition is well-accepted by the courts. *See, e.g.*, *S.E.R.L. v. Attorney General*, 894 F.3d 535, 545–49 (3d Cir. 2018) (describing the Board's efforts to refine *Acosta*'s core framework); *Reyes v. Lynch*, 842 F.3d 1125, 1134 (9th Cir. 2016) (same). As the Seventh Circuit has explained, "if the 'members' have no common characteristics they can't constitute a group, and if they can change [their common] characteristics—that is, cease to belong to the group—without significant hardship, they should be required to do so rather

than be allowed to resettle in [the United States] if they do not meet the ordinary criteria for immigration to this country." *Gatimi v. Holder*, 578 F.3d 611, 614 (7th Cir. 2009). Significantly for this case, moreover, a social group must exist independently of the harm suffered by the asylum applicant, i.e., "the persecution cannot be what defines the contours of the group." *Escobar v. Gonzales*, 417 F.3d 363, 367 (3d Cir. 2005). For this reason, the Board has "resist[ed] efforts to classify people who are targets of persecution as members of a particular social group when they have little or nothing in common beyond being targets." *Gatimi*, 578 F.3d at 616. The parties refer to this principle as the circularity rule.

Narrowing our focus even further, the agency action at issue in this case addresses persecution by non-governmental actors, like gangs and spouses. Under longstanding administrative and judicial precedent, the term "persecution," undefined in the INA, encompasses harm inflicted by non-state actors. *See Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1060 (9th Cir. 2017) (en banc) (explaining that "[t]he concept of persecution by non-state actors is 'inherent' in . . . the Refugee Act," which amended the INA); Deborah Anker, Law of Asylum in the United States § 4:10 (2019 ed.) ("In U.S. law, recognition of the non-state actor doctrine is long-standing, pre-dating the 1980 incorporation of the international refugee definition into the [INA]."). In order to obtain asylum based on persecution by non-state actors, applicants must show that their governments were "unable or unwilling to control" the persecutors. *See, e.g.*, *Bringas-Rodriguez*, 850 F.3d at 1062–68 (collecting cases applying the "unable or unwilling" standard).

This case traces its roots to the asylum petition of an El Salvadoran mother, A.B., who entered the United States unlawfully and claimed that she suffered persecution on account of her membership in the "purported particular social

group of El Salvadoran women who are unable to leave their domestic relationships where they have children in common with their partners." *Matter of A-B-*, 27 I. & N. Dec. 316, 321 (2018) (internal quotation marks omitted). In support, A.B. produced evidence that "her ex-husband, with whom she share[d] three children, repeatedly abused her physically, emotionally, and sexually during and after their marriage." *Id*. An immigration judge denied A.B.'s asylum application, but the Board reversed, finding that A.B.'s social group was "substantially similar" to the group "married women in Guatemala who are unable to leave their relationship"—a group it had approved in an earlier case, *Matter of A-R-C-G-*, 26 I. & N. Dec. 388 (BIA 2014). *A-B-*, 27 I. & N. Dec. at 321. (internal quotation marks omitted). The Board also found "that the El Salvadoran government was unwilling or unable to protect [A.B.]" from abuse and thus concluded that she satisfied the requirements for asylum. *Id.*

Pursuant to DOJ regulations, the Attorney General, then Jefferson Sessions, "direct[ed] the Board to refer" A.B.'s case to him for review, 8 C.F.R. § 1003.1(h)(1)(i), and sought briefing on the question "whether, and under what circumstances, being a victim of private criminal activity constitutes a cognizable 'particular social group' for purposes of an application for asylum or withholding of removal," *A-B-*, 27 I. & N. Dec. at 317. He then vacated the Board's decision finding that A.B. had met the statutory definition of "refugee" and overruled *A-R-C-G-*, 26 I. & N. Dec. 388, the decision on which the Board had relied in granting A.B.'s asylum application. *See A-B-*, 27 I. & N. Dec. at 317.

In his opinion, the Attorney General first reviewed the Board's social-group caselaw, explaining that applicants seeking asylum based on particular social group membership must establish "that [the group] exists independently of the

alleged . . . harm[] [and] demonstrate that their persecutors harmed them on account of their membership in that group rather than for personal reasons." *Id.* He then cautioned:

> Generally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify for asylum. While I do not decide that violence inflicted by non-governmental actors may never serve as the basis for an asylum or withholding application based on membership in a particular social group, in practice such claims are unlikely to satisfy the statutory grounds for proving group persecution that the government is unable or unwilling to address.

*Id.* at 320 (footnote omitted). "Accordingly," he added, "few such claims would satisfy the legal standard to determine whether an alien has a credible fear of persecution," citing the IIRIRA provision that governs credible-fear interviews. *Id.* at 320 n.1 (citing 8 U.S.C. § 1225(b)(1)(B)(v)). The Attorney General also reiterated that asylum seekers alleging non-state-actor persecution must show that their governments are "unable or unwilling to prevent" the persecution. *Id.* at 338. He added, however, that such applicants "must show that the government condoned the private actions or at least demonstrated a complete helplessness to protect the victims." *Id.* at 337 (internal quotation marks omitted).

USCIS then issued a policy memorandum to provide guidance to asylum officers "for determining whether a petitioner is eligible for asylum . . . status in light of the Attorney General's decision in *Matter of A-B-.*" USCIS, Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with *Matter of*

*A-B-* 1, PM-602-0162 (July 11, 2018), Joint Appendix (J.A.) 353 ("Guidance"). In addition to summarizing and restating *A-B-*, especially its discussion of asylum claims based on persecution by non-state actors on account of an applicant's membership in a particular social group, the Guidance announced that, in making credible-fear determinations, officers should apply the law of "the circuit where the alien is physically located during the credible fear interview." *Id.* at 9, J.A. 361. Until then, USCIS had generally applied the circuit law most favorable to applicants. We shall have much more to say about this later.

With this background in mind, we turn to the facts of this particular case. Twelve asylum seekers challenged both *A-B-* and the Guidance in the district court, alleging that several of the policies announced by the Attorney General and USCIS violate the INA, the APA, and the U.S. Constitution. Compl. ¶¶ 6–11. The asylum seekers, most from Central America, all testified to asylum officers that they suffered, or faced threats of, sexual abuse or physical violence at the hands of romantic partners or gangs. *Id.* ¶¶ 15–23. Cindy Ardon Mejia, for example, testified that she "fled her home in Central America with her young daughter . . . after suffering . . . rape, physical beatings, and shootings carried out by her daughter's father and members of his gang" and that she "repeatedly sought police protection" in her home country but never received it. *Id.* ¶ 23. An asylum officer nonetheless found that Ardon Mejia had failed to demonstrate a significant possibility that she would qualify for asylum—that is, that she lacked a "credible fear of persecution"—and after an immigration judge agreed, she was removed to her home country. *Id.* The other asylum seekers alleged similar experiences. Although asylum officers found each asylum seeker credible, all were nonetheless ordered removed from the United States.

In their lawsuit, the asylum seekers challenged four specific policies: (1) the condoned-or-completely helpless standard for non-state persecution claims; (2) the requirement that officers apply the law of the circuit where the credible-fear interview occurs; (3) the standard for analyzing claims of persecution "on account of . . . membership in a particular social group," 8 U.S.C. § 1101(a)(42)(A); and (4) the Attorney General's statement, repeated by USCIS in the Guidance, that "generally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify for asylum," *A-B-*, 27 I. & N. Dec. at 320.

The district court began by finding that it had jurisdiction to review both *A-B-* and the Guidance. It then ruled that three of the policies—the non-state actor standard, the choice-of-law policy, and the "categorical ban" on domestic- and gang-violence claims—are contrary to law and arbitrary and capricious. *See Grace v. Whitaker*, 344 F. Supp. 3d 96, 126, 146 (D.D.C. 2018). It also found the Guidance's directive regarding how asylum officers should analyze claims of persecution "on account of . . . membership in a particular social group" arbitrary and capricious on the ground that it departed from agency policy without explanation. *Id.* at 132–33. The court granted summary judgment in the asylum seekers' favor, declared the four policies unlawful, vacated them, and permanently enjoined defendants—the Attorney General, the DHS Secretary, the USCIS Director, and the Director of the Executive Office for Immigration Appeals—and their agents from applying them in credible-fear proceedings. *See* Order, *Grace v. Whitaker*, No. 18-cv-1853 (D.D.C. June 3, 2019). The court never reached the asylum seekers' constitutional claims, *Grace*, 344 F. Supp. 3d at 141 n.27, and they do not press them here. The government now appeals. Our review is de novo. *See Aamer v. Obama*, 742 F.3d 1023, 1028 (D.C. Cir. 2014) (reviewing the district court's

subject-matter jurisdiction ruling de novo); *Purepac Pharmaceutical Co. v. Thompson*, 354 F.3d 877, 883 (D.C. Cir. 2004) ("Because the district court entered a summary judgment, we review its decision de novo and therefore, in effect, review directly the decision of the agency." (alteration omitted)).

## II.

We start with the government's argument that 8 U.S.C. § 1252, titled "[j]udicial review of orders of removal," barred the district court from considering the asylum seekers' challenges to *A-B-* and the Guidance.

As our court recently explained, although much of section 1252 "limits and channels judicial relief directly into the federal appellate courts or habeas corpus proceedings," subsection (e)(3) expressly "provide[s] in the expedited removal context for more traditional judicial review of 'challenges on validity of the system,'" *Make the Road*, 2020 WL 3421904, at *6 (quoting 8 U.S.C. § 1252(e)(3)), including agency policies governing credible-fear interviews. As relevant here, that provision states:

> Judicial review of determinations under section 1225(b) [governing expedited removal] of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of . . . whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.

8 U.S.C. § 1252(e)(3)(A)(ii). Any such action "must be filed no later than 60 days after the date the challenged . . . regulation, directive, guideline, or procedure . . . is first implemented." *Id.* § 1252(e)(3)(B).

The parties agree that the reference to the Attorney General includes the DHS Secretary. And because the asylum seekers challenged *A-B-* and the Guidance within the sixty-day period, the only question before us is whether the Guidance and *A-B-* qualify as "regulation[s], . . . written policy directive[s], written policy guideline[s], or written procedure[s] issued . . . to implement . . . section [1225(b)]." *Id.* § 1252(e)(3)(A)(ii). They do.

## A. The Guidance

Using language mirroring section 1252(e)(3), the Guidance describes itself as a "*policy* memorandum" that "provides *guidance*" to USCIS officers. Guidance 1, J.A. 353 (emphasis added). And citing section 1225, the provision governing expedited removal, the Guidance instructs "all USCIS employees" on how to apply *A-B-* "consistent[ly]" throughout several types of proceedings, including "credible fear . . . adjudications." *Id*. In its brief, moreover, the government explains that the Guidance "alerts USCIS officers to new binding precedent and tells them how to operationalize that precedent in various contexts, including expedited removal." Appellants' Br. 31. As described by both USCIS in the Guidance and the government in its brief, then, the Guidance qualifies as a "written policy directive" or "guideline" that "implement[s]" section 1225(b). 8 U.S.C. § 1252(e)(3)(A)(ii).

The government nonetheless insists that the Guidance falls outside section 1252(e)(3)'s scope because it "implement[s] *A-B-*, which in turn[] implements [section 1158]" and "thus

does not implement section 1225(b)(1)." Appellants' Br. 31 (internal quotation marks omitted); *see also* Dissenting Op. at 16–17. As the government sees it, section 1158 addresses the "substantive content of asylum law," whereas section 1225(b) establishes procedures for implementing the expedited-removal system. Appellants' Br. 25 (emphasis omitted). So according to the government, the Guidance "implements" section 1158's substantive asylum standards, not section 1225(b)'s expedited-removal system.

This substance-procedure distinction finds no support in the statute's text. Section 1225(b) expressly links the credible-fear standard to the statutory requirements for asylum by defining "credible fear" as "a significant possibility . . . that the alien could establish eligibility for asylum *under section 1158*." 8 U.S.C. § 1225(b)(1)(B)(v) (emphasis added). To be sure, section 1225(b) requires immigration officials to follow several procedural steps, but the credible-fear definition itself encompasses the *substantive* requirement that an alien demonstrate a "significant possibility" of asylum eligibility. *Id.*

The government also argues that the asylum seekers' suit is barred by section 1252(a)(2)(A)(iii), which withdraws district-court jurisdiction over "'the application of' section 1225(b)(1) 'to individual aliens, including the determination made under section 1225(b)(1)(B).'" Appellants' Br. 30 (quoting 8 U.S.C. § 1252(a)(2)(A)(iii)); *see also* Dissenting Op. at 11–16. That provision, however, forbids review of individual aliens' credible-fear determinations, not suits like this that challenge credible-fear policies on their face. *See Make the Road*, 2020 WL 3421904, at *8 n.7 ("Romanette (iii) applies specifically to a challenge to the 'application' of the expedited removal process to an 'individual[,]' . . . who must funnel [a] challenge[] to [a] final order[] of removal into habeas corpus review rather than through Section 1252(e)." (quoting 8

U.S.C. § 1252(a)(2)(A)(iii))). Nothing in the asylum seekers' complaint required the district court to examine how USCIS officers "appl[ied]" the challenged policies "to individual aliens." 8 U.S.C. § 1252(a)(2)(A)(iii).

The Supreme Court reached a similar conclusion in *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991), which involved a virtually identical INA provision that prohibited "'judicial review of a determination respecting an application for adjustment of status.'" *Id.* at 491 (quoting 8 U.S.C. § 1160(e)(1)). Observing that "[t]he critical words . . . describe the provision as referring only to review 'of *a determination* respecting *an application*,'" the Court explained that "'a determination' describes a single act rather than a group of decisions or a practice or procedure employed in making decisions." *Id.* at 491–92 (emphasis in original) (quoting 8 U.S.C. § 1160(e)(1)). Such language, the Court continued, "describ[es] the process of direct review of individual denials . . . , rather than . . . referring to general collateral challenges to . . . practices and policies used by the agency." *Id.* at 492. So too here. Section 1252(a)(2)(A)(iii)'s "critical words"—"the application" of section 1225(b)(1) and "the" credible-fear "determination"—"describe[] a single act rather than a group of decisions or a . . . procedure employed in making decisions," *id.* They thus refer to direct review of individual aliens' negative credible-fear determinations, not to facial challenges to the written policies that govern those determinations.

As the asylum seekers point out, the government's view of section 1252(a)(2)(A)(iii) could leave no one able to challenge the policies at issue in this suit. Although the dissent thinks this is irrelevant, *see* Dissenting Op. at 16, we view it as further evidence that our interpretation best "comports with our obligation to interpret the statute's provisions"—here, section

1252(a)(2)(A)(iii) and section 1252(e)(3)—"in harmony with each other," *James Madison Limited by Hecht v. Ludwig*, 82 F.3d 1085, 1093 (D.C. Cir. 1996). Our reading gives full effect to the two provisions, which are best understood to address different matters: section 1252(a)(2)(A)(iii) restricts judicial authority to review how immigration officials apply credible-fear policies in individual cases, while section 1252(e)(3) preserves judicial authority over challenges to the underlying policies themselves. By contrast, the dissent's reading would "impute to Congress a purpose to paralyze with one hand what it sought to promote with the other." *Clark v. Uebersee Finanz-Korporation*, 332 U.S. 480, 489 (1947).

The dissent insists that "the standard petition for review procedure" offers "an alternative avenue for judicial review of *Matter of A-B-* and the Guidance." Dissenting Op. at 15 n.7 (referring to Hobbs Act review of a removal order issued after full consideration of an asylum claim in a standard removal hearing). Not quite. Two of the policies the asylum seekers challenge appear only in the Guidance, and, as best we can tell, are unreviewable through the standard petition-for-review procedure. The first, the choice-of-law policy, applies only at the credible-fear stage, so any aliens eligible to file petitions for review will have suffered no injury from it; they either received positive credible-fear determinations or were not subject to the policy at all. The second, the circularity rule, also applies in interviews conducted by USCIS asylum officers in connection with affirmative asylum applications. *See* 8 C.F.R. § 208.9(a) (stating that USCIS "shall adjudicate" affirmative asylum applications); Guidance 1, J.A. 353 ("[The Guidance] applies to and shall be used to guide determinations by all USCIS employees."). Like aliens found to lack credible fear, however, aliens denied asylum by USCIS officers after affirmative-application interviews generally cannot obtain judicial review of that decision. *See* Anker, *supra*, app. A

16

§ A2:39 ("No appeal beyond USCIS is available to applicants whose affirmative asylum applications have been denied . . . ."); *Dhakal v. Sessions*, 895 F.3d 532, 540 (7th Cir. 2018) (describing the affirmative asylum process and concluding that denial by an asylum officer is non-final). Given this, we are unconvinced that the petition-for-review procedure provides an "alternative avenue" for review of the Guidance.

The dissent also contends that courts interpreting section 1252 have "adopted" a "consistent understanding of 'review'" that "necessarily means that the plaintiffs ask for 'review' of their credible fear determinations." Dissenting Op. at 13 n.6. But the cases the dissent cites in support of this claim mention neither credible-fear interviews nor expedited removal, so those courts had no need to harmonize the provisions at issue with section 1252(e)(3). For example, in *Zhu v. Gonzalez*, 411 F.3d 292 (D.C. Cir. 2005), we found judicial review barred by section 1252(a)(2)(B)(ii), which withdraws jurisdiction over challenges to "any . . . decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in [their] discretion," 8 U.S.C. § 1252(a)(2)(B)(ii). We have since held, however, that even where a decision is committed to the Secretary's discretion by law—in which case section 1252(a)(2)(B)(ii), read in isolation, would appear to prohibit judicial review—section 1252(e)(3) operates to preserve district-court jurisdiction so long as the challenged decision implements section 1225(b). *See Make the Road*, 2020 WL 3421904, at *11 ("[W]hatever [section 1252(a)(2)(B)]'s jurisdictional bar covers, it is not the type of challenges to the Secretary's . . . policies[] and directives specifically implementing the expedited removal scheme for which Section 1252(e) expressly grants jurisdiction."). The same logic requires that we read section 1252(a)(2)(A)(iii)'s jurisdictional bar in tandem with section 1252(e)(3). That is, even if, as the

dissent argues, section 1252(a)(2)(A)(iii), read in isolation, could reasonably be understood to withdraw jurisdiction over the asylum seekers' claims—and, to be clear, we do not think it can, *see supra* at 13–14 (citing *Make the Road*, 2020 WL 3421904, at \*8 n.7, and *McNary*, 498 U.S. at 491–92)—section 1252(e)(3) decisively refutes that understanding.

Changing tack, the government argues that the district court's "sweeping nationwide injunction . . . underscores the serious error in [its] exercise of jurisdiction to begin with." Appellants' Br. 32. But the government concedes that the district court has authority to "[declare] any reviewable action unlawful and set it aside." Reply Br. 9. Given this, whether the district court had authority to enter an injunction has no bearing on its jurisdiction to review the Guidance since, as the government acknowledges, the court had authority to order other relief. *See Nielsen v. Preap*, 139 S. Ct. 954, 962 (2019) (plurality opinion) (explaining that "[w]hether the [district] court had jurisdiction to enter . . . a[] [classwide] injunction is irrelevant because [it] had jurisdiction to entertain the plaintiffs' request for declaratory relief"); *Make the Road*, 2020 WL 3421904, at \*15 (same).

We thus see no jurisdictional obstacle to the district court's review of the choice-of-law policy and the circularity rule, as they appear only in the Guidance. But the other two challenged policies—the condoned-or-completely-helpless standard and the Attorney General's statement regarding domestic and gang violence claims—are contained in both the Guidance and *A-B-*, meaning that we must address the district court's jurisdiction to review the latter.

## B. *A-B-*

Recall that section 1252(e)(3) authorizes review of "a . . . written policy directive, written policy guideline, or

written procedure issued by or under the authority of the Attorney General to implement [section 1225(b)]." 8 U.S.C. § 1252(e)(3)(A)(ii). In our view, *A-B-* falls within this section's scope.

To begin with, the decision expressly references the credible-fear standard and asylum officers' role in implementing the expedited-removal system. It declares that "[w]hen confronted with asylum cases based on purported membership in a particular social group . . . *asylum officers* must analyze the requirements as set forth in this opinion, which restates and where appropriate, elaborates upon, the requirements [for asylum]." *A-B-*, 27 I. & N. Dec. at 319 (emphasis added). It also states that "few [domestic violence and gang violence] claims would satisfy the legal standard to determine whether an alien has a credible fear of persecution," citing the statutory provision governing credible-fear interviews. *Id.* at 320 n.1 (citing 8 U.S.C. § 1225(b)(1)(B)(v)). The decision's overarching purpose, moreover, is to interpret section 1158's phrase "membership in a particular social group," which Congress incorporated into section 1225(b) by defining "credible fear of persecution" as "a significant possibility . . . that the alien could establish eligibility for asylum under section 1158." 8 U.S.C. § 1225(b)(1)(B)(v). In short, like the Guidance, *A-B-* qualifies as a "written policy directive" or "written policy guideline" "issued by . . . the Attorney General to implement [section 1225(b)]." *Id.* § 1252(e)(3)(A)(ii).

Arguing to the contrary, the government points out that *A-B-* "was an *adjudication* in full removal proceedings under 8 U.S.C. § 1229a." Appellants' Br. 24; *see also* Dissenting Op. at 17. True enough, but we have often recognized that agencies can and do announce new policies in adjudications. *See, e.g.*, *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 497 (D.C. Cir.

2015) (noting that agencies may "announc[e] new principles in an adjudicative proceeding" (internal quotation marks omitted)). Were this sufficient to remove the decision from section 1252(e)(3)'s scope, moreover, then the Attorney General could immunize credible-fear policies from judicial review by simply announcing them in section 1229a adjudications. Such a result would conflict with section 1252(e)(3)'s purpose: to authorize, as its title makes clear, "[c]hallenges on [the] validity of the [expedited-removal] system." 8 U.S.C. § 1252(e)(3); *see also Make the Road*, 2020 WL 3421904, at *6 ("[A]t every turn, [section 1252] expressly preserve[s] jurisdiction over . . . claims of legal or constitutional error in . . . rules implementing expedited removal.").

The dissent offers an additional argument based on section 1252's structure. According to the dissent, "if section [1252(e)(3)] grants our district court jurisdiction to review [*A-B-*] . . . , it follows from the parallel language of sections 1252(e)(3)(A)(ii) and 1252(a)(2)(A)(iv) that the latter provision bars a court of appeals from reviewing any adjudicatory decision by the Attorney General or the BIA that touches on asylum." Dissenting Op. at 19. We respectfully disagree. Section 1252(a)(2)(A)(iv), which provides that "except as provided in subsection (e)," "no court shall have jurisdiction to review . . . procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1)," channels facial challenges to expedited-removal policies to the district court for the District of Columbia. 8 U.S.C. § 1252(a)(2)(A)(iv); *see also id.* § 1252(e)(3). Contrary to the dissent, however, that provision leaves open the possibility that some such "procedures and policies" might be "adopted by the Attorney General" to "implement . . . section 1225(b)(1)" and also for other purposes, meaning that the policies could simultaneously be challenged in the district court

for the District of Columbia pursuant to section 1252(e)(3) and also through a petition for review of a BIA decision. Indeed, review of *A-B-* has proceeded on precisely such parallel tracks, with the Fifth Circuit noting that "[t]he *Grace* [district] court's order does not prevent us from reviewing *A-B-* in order to rule on [a] petition for review" because "the court vacated *A-B-* and the [Guidance] as they pertain to credible-fear claims in expedited removal proceedings only." *Gonzales-Veliz v. Barr*, 938 F.3d 219, 228 (5th Cir. 2019); *see also De Pena-Paniagua v. Barr,* 957 F.3d 88, 93 (1st Cir. 2020) (considering challenge to *A-B-* on petition for review from a final order of removal).

Another point bears mention. We do not hold today that a plaintiff may seek review of every BIA or Attorney General decision regarding asylum. Far from it, we hold only that the district court had jurisdiction to review *this* Guidance and that such jurisdiction extended to *A-B-* to the extent the Guidance incorporates *A-B-*.

Finally, even were section 1252 "reasonably susceptible to divergent interpretation," circuit precedent requires that we "adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review." *Make the Road*, 2020 WL 3421904, at *6 (internal quotation marks omitted); *see also id.* at *5–6 (expressly rejecting the argument that this "strong presumption" is inapplicable to section 1252 (internal quotation marks omitted)). Applying that presumption here would "dispel[]" "[a]ny lingering doubt about the proper interpretation of" section 1252. *Kucana v. Holder*, 558 U.S. 233, 251 (2010). Having assured ourselves of the district court's jurisdiction, and accordingly our own, we turn to the merits. *See Make the Road*, 2020 WL 3421904, at *5 (noting appellate jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) where 8 U.S.C. § 1252(e)(3) preserved district court's federal-

question jurisdiction over APA challenge to Secretary's memorandum).

## III.

As both sides acknowledge, it is "well settled that principles of *Chevron* deference are applicable" to the Attorney General's interpretation of the INA. *Negusie v. Holder*, 555 U.S. 511, 516 (2009) (internal quotation marks omitted). Accordingly, to the extent the challenged policies represent the Attorney General's interpretations of that statute, we ask "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842 (1984). "If the intent of Congress is clear, that is the end of the matter; for [we], as well as the [Attorney General], must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43.

For those policies that are "not . . . interpretation[s] of any statutory language," however, "the more apt analytic framework . . . is standard 'arbitrary [or] capricious' review under the APA." *Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011) (alterations in original). "Under this narrow standard of review, a court is not to substitute its judgment for that of the agency, but instead to assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *DHS v. Regents of the University of California*, 140 S. Ct. 1891, 1905 (2020) (internal quotation marks omitted) (citation omitted). "That task involves examining the reasons for agency decisions—or, as the case may be, the absence of such reasons." *Judulang*, 565 U.S. at 53.

## A.  Condoned or Completely Helpless

Citing *A-B-*, the Guidance instructs officers that "[i]n cases where the persecutor is a non-government actor, the applicant must show the harm or suffering was inflicted by persons or an organization that his or her home government is unwilling or unable to control, such that the government either 'condoned the behavior or demonstrated a complete helplessness to protect the victim.'" Guidance 2, J.A. 354 (quoting *A-B-*, 27 I. & N. Dec. at 337). The asylum seekers argue that the term "persecution," 8 U.S.C. § 1101(a)(42)(A), incorporates the unwilling-or-unable standard for asylum claims involving non-governmental persecutors and thus precludes use of the more demanding condoned-or-completely-helpless standard adopted by *A-B-* and the Guidance. To prevail on this claim, the asylum seekers must show that the unwilling-or-unable standard is so "unambiguously expressed" in the statute that "we must impose it upon the agency initially responsible for interpreting the statute, despite the deference otherwise accorded under *Chevron*." *Fort Stewart School v. FLRA*, 495 U.S. 641, 647 (1990). This they have failed to do.

The INA nowhere defines the term "persecution," let alone addresses the standards for government conduct, and nothing in the statute otherwise speaks directly "to the precise question at issue," *Chevron*, 467 U.S. at 842—the level of government culpability required to qualify for asylum. The asylum seekers insist that the statute's silence makes no difference because "[the unwilling-or-unable] standard has been a settled construction of the term 'persecution' since before Congress established the modern asylum system in 1980," i.e., the year it enacted the Refugee Act, the source of section 1101(a)(42)(A). Appellees' Br. 40. In support, they make two arguments, neither of which is persuasive.

They first rely on a handbook issued by the United Nations High Commissioner for Refugees, which states that "persecution" includes harm by non-governmental actors "if . . . knowingly tolerated by the authorities, or if the authorities refuse, or prove unable, to offer effective protection." U.N. High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status ¶ 65 (1979) ("Handbook"). Urging us to import the Handbook's standard into the statute, the asylum seekers cite *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987), in which the Supreme Court relied on the Handbook as evidence of the meaning of the phrase "well-founded fear of persecution." *See id.* at 438–39 ("In interpreting . . . 'refugee' [in the United Nations Protocol Relating to the Status of Refugees] we are further guided by the analysis set forth in the [Handbook]."). There, however, the Court used the Handbook to "confirm[]" "the message conveyed by the *plain language* of the Act." *Id.* at 432 (emphasis added). In this case, the asylum seekers ask us to do the opposite—use the Handbook to divine clarity from ambiguous statutory language, something we cannot do. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999) ("The U.N. Handbook may be a useful interpretative aid, but it is not binding on the Attorney General, the [Board], or United States courts."); *Cardoza-Fonseca*, 480 U.S. at 439 n.22 ("We do not suggest, of course, that the explanation in the U.N. Handbook has the force of law or in any way binds the [Immigration and Naturalization Service] with reference to the asylum provisions of [8 U.S.C. § 1158(a)].").

The asylum seekers next argue that "domestic law at the time of the Refugee Act" had settled the meaning of the term "persecution" and that "Congress intended to adopt this judicial and administrative construction." Appellees' Br. 43 (internal quotation marks omitted); *see also Grace*, 344 F. Supp. 3d at 128 (finding it "clear at the time the Act was passed" that

Congress intended to adopt the "unable or unwilling" standard). But the "domestic law" they cite—a single circuit court decision and two Board decisions—is far too sparse for us to conclude that when Congress enacted the Refugee Act, it "would have surveyed the jurisprudential landscape and necessarily concluded that the courts had already settled the question." *Lightfoot v. Cendant Mortgage Corp.*, 137 S. Ct. 553, 564 (2017); *cf. Banister v. Davis*, 140 S. Ct. 1698, 1706–07 (2020) (finding that one Supreme Court decision and multiple court of appeals decisions established a "legal backdrop"); *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) (finding statute's meaning "settled" where Office of Legal Counsel opinion, twelve judicial decisions, and multiple federal agencies interpreted term consistently and "[a]ll indications [we]re that Congress was well aware of th[at] position" when it incorporated that term into the statute). In any event, the decisions the asylum seekers cite are themselves ambiguous regarding the non-government persecutor standard. *See Rosa v. INS*, 440 F.2d 100, 102 (1st Cir. 1971) (not discussing the precise standard for determining when non-governmental persecutors "[have] sufficient . . . power to carry out [their] purposes without effective hindrance"); *Matter of Eusaph*, 10 I. & N. Dec. 453, 454–55 (BIA 1964) (using the terms "unable," "sponsored," "tolerated," and "condone" without distinguishing among them); *Matter of Stojkovic,* 10 I. & N. Dec. 281, 287 (BIA 1963) ("not consider[ing]" "whether intentional physical harm . . . by a riotous mob, acting without the sanction of the Dominican Government, would amount to physical persecution").

Alternatively, the asylum seekers argue that the condoned-or-completely-helpless standard is arbitrary and capricious. Specifically, they contend that the Board has historically required applicants to demonstrate only that their governments are "unwilling or unable" to protect them, and that the Attorney

General and USCIS adopted the new, more demanding standard "without acknowledging and explaining the change[,] violat[ing] the rule that '[an] agenc[y] may not . . . depart from a prior policy *sub silentio*.'" Appellees' Br. 48 (emphasis omitted) (quoting *American Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017)). The government insists that no change occurred, that is, that the two standards are identical. The asylum seekers have the better of the argument.

To begin with, as a matter of plain language, the two formulations are hardly interchangeable. A government that "condones" or is "completely helpless" in the face of persecution is obviously more culpable, or more incompetent, than one that is simply "unwilling or unable" to protect its citizens. Take, for example, the facts of a recent First Circuit decision, where a Mexican man sought asylum after his son was murdered by individuals he believed to be organized criminals. Evidence at the applicant's removal hearing demonstrated that after the murder, federal police visited "the scene where [his son's] body was recovered" and "took statements from [him] and his wife" and that "an autopsy was performed." *Rosales Justo v. Sessions*, 895 F.3d 154, 159 (1st Cir. 2018). Although this was sufficient to establish that some "police took an immediate and active interest in [the applicant's] son's murder," other evidence—corruption among state and local police, local residents' "lack [of] faith" in police, and high homicide rates—showed that organized criminals generally operated with impunity within the applicant's home state. *Id.* at 159–60. Under the unwilling-or-unable standard, the applicant would qualify for asylum because, though the police investigation demonstrated his home government's willingness to intervene, the evidence of criminal impunity demonstrated its inability to offer him effective protection. *See id.* at 167 (concluding that "country condition

reports . . . combined with [the applicant's] testimony about the particular circumstances of his case[] were sufficient to support the . . . finding that the police in [the applicant's home state] would be unable to protect Rosales from persecution by organized crime"). By contrast, under the condoned-or-completely-helpless standard, the applicant's asylum claim would fail because his home government, far from condoning the violence or being completely helpless in response to the murder, responded to the crime scene, took statements from the asylum seeker and his wife, and autopsied the body.

The government emphasizes that several courts of appeals, despite reciting the condoned-or-completely-helpless standard, never actually required asylum applicants to meet that higher standard. *See, e.g.*, *Hor v. Gonzales*, 421 F.3d 497, 502 (7th Cir. 2005) (finding military's inability to protect petitioner and court's inability to offer relief "strong evidence" that Algerian government was "incapable" of protecting petitioner); *Galina v. INS*, 213 F.3d 955, 958 (7th Cir. 2000) (finding that petitioner suffered persecution despite some police action in response to threatening phone calls). The Guidance, however, instructs asylum officers to follow *the Guidance*, emphasizing that it "applies to and shall be used to guide determinations by all USCIS employees." Guidance 1, J.A. 353. And the Guidance requires asylum officers to apply the more demanding standard:

> In a case where the alleged persecutor is not affiliated with the government, the applicant must show the government is unable or unwilling to protect him or her. When the harm is at the hands of a private actor, the applicant must show more than the government's difficulty controlling the private behavior. The applicant must show the government condoned

> the private actions or at least demonstrated a complete helplessness to protect the victim.

*Id.* at 6, J.A. 358 (internal citations omitted); *see also id.* at 10, J.A. 362 ("Again, the home government must either condone the behavior or demonstrate a complete helplessness to protect victims of such alleged persecution."). To be sure, as the government points out, the Guidance also includes the unwilling-or-unable language. *See id.* at 2, J.A. 354 (explaining that applicants must show that their home governments were "unwilling or unable to control [the persecutors], such that the government either 'condoned the behavior or demonstrated a complete helplessness to protect [them]'" (quoting *A-B-*, 27 I. & N. Dec. at 337)). But if the government is suggesting that asylum officers can choose between the two standards, then "[a]n alien appearing before one official may suffer deportation; an identically situated alien appearing before another may gain the right to stay in this country." *Judulang*, 565 U.S. at 58. This, the Supreme Court has warned, is precisely "what the APA's 'arbitrary and capricious' standard is designed to thwart." *Id.* at 59.

In short, contrary to the government's arguments, the two standards differ. And putting all of its eggs in the "no change" basket, the government does not, in the alternative, defend the condoned-or-completely-helpless standard on the merits. That is, nowhere does it argue that even if the policy changed, the Attorney General or USCIS "provide[d] a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). Accordingly, we have no choice but to find the standard arbitrary and capricious. Because this, by itself, requires setting aside the new standard, we need not reach the asylum seekers' alternative argument that the new standard conflicts with the Refugee Act's "well-

founded fear" standard and IIRIRA's "significant possibility" standard.

## B. Choice of Law

This policy, which USCIS adopted on its own—i.e., not in response to *A-B-*—requires asylum officers conducting credible-fear interviews to "faithfully apply precedents of the Board and, if necessary, the circuit where the alien is *physically located* during the credible fear interview." Guidance 9, J.A. 361 (emphasis added). By contrast, under USCIS's prior policy, officers generally applied "the interpretation most favorable to the applicant." USCIS, Lesson Plan: Credible Fear of Persecution and Torture Determinations 17 (Feb. 13, 2017), J.A. 379 ("Lesson Plan"). According to the asylum seekers, the new policy is arbitrary and capricious because "it represents a dramatic, unacknowledged, and unexplained departure from years of prior agency practice." Appellees' Br. 30.

As our court recently explained, "[r]easoned decision-making requires that when departing from precedents or practices, an agency must 'offer a reason to distinguish them or explain its apparent rejection of their approach.'" *Physicians for Social Responsibility v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) (quoting *Southwest Airlines Co. v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019)). Although "[not] every agency action representing a policy change must be justified by reasons more substantial than those required to adopt a policy in the first instance," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009), "however the agency justifies its new position, what it may not do is 'gloss[] over or swerve[] from prior precedents without discussion,'" *Southwest Airlines*, 926 F.3d at 856 (alterations in original) (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)).

According to the government, "the extent of any divergence" between its prior policy and the new policy is "debatable," Reply Br. 15, thus making it "far from clear" that there was "any need" to acknowledge any change, Appellants' Br. 39. We disagree.

The old policy appears in a USCIS Lesson Plan, which provides that:

> Questions as to how the [credible-fear] standard is applied should be considered in light of the nature of the standard as a screening standard . . . . [W]here there is:
>
> a. disagreement among the United States Circuit Courts of Appeal as to the proper interpretation of a legal issue; or,
>
> b. the claim otherwise raises an unresolved issue of law; and,
>
> c. there is no DHS or Asylum Division policy or guidance on the issue, then
>
> generally the interpretation *most favorable* to the applicant is used when determining whether the applicant meets the credible fear standard.

Lesson Plan 17, J.A. 379 (original emphasis omitted and emphasis added). As the government emphasizes, the Lesson Plan contained an exception to the most-favorable-law rule: if there is "DHS or Asylum Division policy or guidance on the issue," then officers should apply such guidance. *Id.* (emphasis omitted). But this makes no difference for our purposes because the new policy requires asylum officers to apply local circuit law in *every* circumstance, thus "eliminat[ing] the most-

favorable-interpretation rule on *every* issue," not just on "specific issue[s]" for which the agency has issued guidance. Appellees' Br. 36. In other words, even under the government's own telling, USCIS's new policy differs significantly from the old one.

Nothing in the Guidance acknowledges this change. In full, here is what the Guidance says about the choice-of-law policy:

> [R]emoval proceedings can take place in any forum selected by DHS, and not necessarily the forum where the intending asylum applicant is located during the credible fear or reasonable fear interview. Because an asylum officer cannot predict with certainty where DHS will file a Notice to Appear or Notice of Referral to Immigration Judge, and because there may not be removal proceedings if the officer concludes the alien does not have a credible fear or reasonable fear and the alien does not seek review from an immigration judge, the asylum officer should faithfully apply precedents of the Board and, if necessary, the circuit where the alien is physically located during the credible fear interview.

Guidance 9, J.A. 361. From this, readers would have no idea that prior to issuing the Guidance, USCIS generally applied the law most favorable to applicants. Put in terms of our caselaw, the Guidance has "gloss[ed] over or swerve[d] from prior precedents without discussion," "cross[ing] the line from the tolerably terse to the intolerably mute." *Greater Boston Television*, 444 F.2d at 852.

USCIS's failure to acknowledge the change in policy is especially egregious given its potential consequences for asylum seekers. Under the previous policy, applicants either got the benefit of the doubt—because officers applied the most favorable circuit law—or were at least treated equally across circuits because officers applied nationally uniform guidance. But under the new policy, "a noncitizen who would be eligible for asylum in the circuit where [removal] proceedings would ultimately take place can be issued a negative credible-fear determination and summarily removed, simply because the circuit in which the screening interview takes place happens to have unfavorable law." Appellees' Br. 32. USCIS has thus "fail[ed] to grapple with how [the new] policy affected its statutory . . . mandate[]," *Physicians*, 956 F.3d at 647—to ensure that aliens who demonstrate "a significant possibility . . . [of] eligibility for asylum under section 1158" are not summarily removed, 8 U.S.C. § 1225(b)(1)(B)(v). Such silence, the Supreme Court has made clear, fails the APA's requirement of reasoned decisionmaking because it ignores "an important aspect of the problem." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm*, 463 U.S. 29, 43 (1983).

The government argues that it had no obligation to acknowledge the change because the old policy appeared only in the USCIS Lesson Plan. In support, it cites our decision in *Vietnam Veterans of America v. Secretary of the Navy*, 843 F.2d 528 (D.C. Cir. 1988), in which we ruled that a servicemember could not challenge his military discharge on the ground that failed to comply with a Navy policy memorandum. *See id.* at 537–38 ("[T]he . . . [m]emorandum cannot reasonably be classified as a binding statement."). But the policy involved in that case was quite different from the one at issue here. As explained in *Vietnam Veterans*' very first paragraph, the policy at issue there was "not specific or

prescriptive enough . . . to bind agency discretion," *id.* at 530, and there "[was] no evidence in the record that the Secretary," who authored the policy, "ha[d] ever applied [it] in an inflexible fashion or used it to limit significantly the [military] review boards' discretion," *id.* at 539. Here, by contrast, the government nowhere claims that immigration officials were free to depart from USCIS's previous choice-of-law policy. Quite to the contrary, the Lesson Plan reminded asylum officers that they were expected to "*correctly* make . . . credible fear determination[s] *consistent with* the . . . policies[] and procedures that govern . . . credible fear." Lesson Plan 14, J.A. 363 (emphasis added).

Nor does it make any difference that the Lesson Plan was informal, as the government argues. Although the formality of a policy may be relevant in cases where the policy's existence or content is disputed, this is not such a case. The government acknowledges that the Lesson Plan reflected USCIS's "consistent practice," which under our caselaw "sets the baseline from which future departures must be explained." *Southwest Airlines*, 926 F.3d at 858; *see also American Wild Horse*, 873 F.3d at 925 (finding that an agency could not deny the existence of a policy that was "well documented in the administrative record, and . . . reconfirmed repeatedly by two decades of agency practice and official pronouncements").

Alternatively, the government argues that the reasons USCIS offered for the rule—venue uncertainty and the Board's (not USCIS's) practice of applying the law of the circuit in which proceedings occur—"[were] sufficient to fulfill any obligation to explain." Reply Br. 15. That might well be so if the statute's only goal were to ensure efficient removal of aliens with no lawful authorization to remain in the United States. But the statute has a second, equally important goal: ensuring that individuals with valid asylum claims are not

returned to countries where they could face persecution. Both purposes are evident in the system's design and are confirmed throughout the legislative history on which the government relies. *See* 142 Cong. Rec. 25,347 (1996) ("The [significant-possibility] standard . . . is intended to be a low screening standard for admission into the usual full asylum process.") (statement of Sen. Hatch); H.R. Rep. No. 104-469, pt. 1, at 158 (1995) ("Under this system, there should be no danger that an alien with a genuine asylum claim will be returned to persecution."). Appearing to recognize this, the Lesson Plan instructs officers to apply the credible-fear standard "in light of the nature of the standard as a *screening standard* to identify persons who could qualify for asylum . . . , including when there is reasonable doubt regarding the outcome of a credible fear determination." Lesson Plan 17, J.A. 379. And as explained above, the Guidance's choice-of-law policy could undermine this purpose were it to result in the expedited removal of applicants who would have been eligible for asylum had their credible-fear interviews taken place in a different circuit.

In its brief, the government offers two additional justifications for the local-circuit-law policy: that "apply[ing] the law where the action takes place" "is consistent with the most basic and firmly established choice of law rule" and that requiring officers to apply the most favorable law would "result in significant operational burdens." Appellants' Br. 39–40, 41. These rationales, however, appear nowhere in the Guidance, and when "assessing the reasonableness of [an agency's action], we look only to what the agency said at the time of the [action]—not to its lawyers' post-hoc rationalizations." *Good Fortune Shipping SA v. Commissioner of Internal Revenue Service*, 897 F.3d 256, 263 (D.C. Cir. 2018) (internal quotation marks omitted).

Given our conclusion that the new choice-of-law policy is arbitrary and capricious due to USCIS's failure to acknowledge and explain its departure from past practice, we may affirm the district court's order on that basis alone, thus leaving us with no need to consider the asylum seekers' alternative argument that the policy is contrary to law.

## C. Circularity

As noted above, the circularity rule governs how immigration officials analyze asylum claims premised on an applicant's "membership in a particular social group." 8 U.S.C. § 1101(a)(42)(A). As explained in *A-B-*, under Board precedent social groups must "exist independently" of the harm claimed by the applicant, that is, the applicant must be able to establish the group's existence "without defining [it] by the fact of persecution." *A-B-*, 27 I. & N. Dec. at 334.

To understand the precise issue before us, we think it helpful to begin with a few examples that are not circular. One paradigmatic case involves persecution on account of sexual orientation—for example, a gay man fleeing a country where the police are known to assault homosexual men. *See Kadri v. Mukasey*, 543 F.3d 16, 21 (1st Cir. 2008) (collecting cases). Because the social group (gay men) exists independently of the harm alleged (assault), the group is not circular. Another example involves persecution on account of disability—for example, an individual who suffers from bipolar disorder fleeing a country whose government institutionalizes and tortures mentally-ill individuals. *See Temu v. Holder*, 740 F.3d 887, 892 (4th Cir. 2014) (discussing such a claim). Again, because the social group (mentally-ill individuals) exists independently of the harm alleged (torture), the group is not circular.

But whether a group exists independently of the harm alleged is not always so apparent. Consider, for example, the group "women who fear being forced into prostitution." Stated that way, the group is defined by the harm alleged (forced prostitution). But if the women are targeted for forced prostitution because they share a common protected characteristic, such as their political views, then the group exists independently of the harm alleged and thus is not circular. *Cf. Lushaj v. Holder*, 380 F. App'x 41, 43 (2d Cir. 2010) (discussing the group "women whom members of the Haklaj gang wished to kidnap and force into prostitution . . . to punish their family members for their political activities in Albania" (alterations omitted) (internal quotation marks omitted)). Consider another example, Somali women who have suffered female genital mutilation. *See Hassan v. Gonzales*, 484 F.3d 513, 518 (8th Cir. 2007) (describing such a group). At one level, the group is circular because it is defined in part by the harm alleged (female genital mutilation). But it could also be defined independently of the harm by describing the group as Somali women or, depending on the facts, even more narrowly as "young girls in the Benadiri clan," *Mohammed v. Gonzales*, 400 F.3d 785, 797 (9th Cir. 2005). As these examples demonstrate, "it is not fair to conclude that the group is defined by the harm or potential harm inflicted merely by the language used rather than determining what underlying characteristics account for the fear and vulnerability." *Cece v. Holder*, 733 F.3d 662, 672 (7th Cir. 2013) (en banc).

*A-B-* itself illustrates the difficulty in determining whether an applicant's proposed group is circular. The asylum seeker there alleged that she had been abused by her husband on account of her membership in the group of "El Salvadoran women who are unable to leave their domestic relationships where they have children in common with their partners." *A-B-*, 27 I. & N. Dec. at 321 (internal quotation marks omitted). This

group, like the group "women who fear forced prostitution," appears to be defined in part by the alleged harm (being unable to leave a relationship). On closer examination, however, this is not necessarily so. If A.B.'s inability to leave her relationship stems from circumstances independent of the alleged harm—for example, legal constraints on divorce—then the group would not be circular because the "inability to leave" does not refer to harm at all. *See De Pena-Paniagua*, 957 F.3d at 93–94 (explaining that the "inability to leave a relationship may be the product of forces other than physical abuse," such as "cultural, societal, religious, economic, or other factors"). In short, whether a given group is circular depends on the facts of the particular case.

With these examples in mind, we turn to the asylum seekers' argument that the Guidance incorrectly describes the circularity rule as set forth in *A-B-*. There, the Attorney General explained:

> [t]o be cognizable, a particular social group *must* exist independently of the harm asserted in an application for asylum . . . . If a group is defined by the persecution of its members, then the definition of the group moots the need to establish actual persecution. For this reason, the individuals in the group must share a narrowing characteristic other than their risk of being persecuted.

*A-B-*, 27 I. & N. Dec. at 334–35 (citations omitted) (internal quotation marks omitted). Referring to an earlier case, the Attorney General also noted that the group "'married women in Guatemala who are unable to leave their relationship' [is] effectively defined to consist of women in Guatemala who are

victims of domestic abuse because the inability 'to leave' was created by harm or threatened harm." *Id.* at 335.

The asylum seekers do not challenge *A-B-*'s description of the circularity rule, arguing instead that "the Guidance departs from th[at] settled standard." Appellees' Br. 53. We disagree.

The Guidance explains that in *A-B-*, "[t]he Attorney General observed" that the group "'married women in Guatemala who are unable to leave their relationship'" "'was effectively defined to consist of women in Guatemala who are victims of domestic abuse because the inability to leave was created by [the] harm or threatened harm.'" Guidance 5, J.A. 357 (quoting *A-B-*, 27 I. & N. Dec. at 335–36). Focusing on the circularity rule's application to asylum claims founded on domestic violence, the Guidance explains:

> [*A-B-*'s] analysis casts doubt on whether a particular social group defined solely by the ability to leave a relationship can be sufficiently particular. Even if "unable to leave" were particular, the applicant must show something more than the danger of harm from an abuser if the applicant tried to leave, because that would amount to circularly defining the particular social group by the harm on which the asylum claim was based. Officers should carefully examine any proposed particular social group to ascertain whether it contains any attributes that "exist independently of the harm asserted."

*Id.*

Unlike the asylum seekers, we detect no meaningful difference between *A-B-* and the Guidance regarding the circularity rule. Fairly read, the Guidance simply quotes or

paraphrases *A-B-* and betrays no intent to depart from the Attorney General's decision. Nor, contrary to the asylum seekers' claim, does anything in the Guidance categorically bar groups based in part on applicants' inability to leave a relationship. Instead, and read as a whole, the document directs officers to "analyze each case on its own merits in the context of the society where the claim arises," and warns that "analysis of a proposed social group is incomplete whenever the defining terms of the proposed group are analyzed in isolation, rather than collectively." *Id.* at 3, J.A. 355. This is exactly what *A-B-* requires and, as our hypotheticals demonstrate, exactly the analysis required to determine whether a particular claim is or is not circular.

So far, so good. But in its brief, the government asserts that "the group must be 'separate' from the harm, not consisting of the harm, even in part." Reply Br. 23. As the asylum seekers point out, this statement of the rule is flatly inconsistent with both *A-B-* and the Guidance. Indeed, government counsel conceded as much at oral argument. Asked about the inaccurate statement in its brief, counsel agreed that asylum officers must not apply the social-group requirements formulaically and instead must go case-by-case. *See* Oral Arg. Rec. 24:00–03, 25:10–12 (describing how an "asylum officer would elicit further testimony" and "go through the steps" set forth in *A-B-* and the Guidance). And when asked specifically about the group "Guatemalan women unable to leave their relationships," counsel acknowledged that it is "not categorically barred," *id.* at 19:55–58, 21:34–35, and that its validity would turn on the specific factual circumstances of an applicant's claim, *id.* at 21:50–21:53 ("You could, in theory, have that group, if you checked the boxes."). In sum, then, when viewed as a whole, the Guidance accurately restates the circularity rule as described in *A-B-*.

## D. Domestic and Gang Violence

In bold font, the Guidance states that:

> [i]n general, . . . claims based on membership in a putative particular social group defined by the members' vulnerability to harm of domestic violence or gang violence committed by non-government actors will not establish the basis for asylum, refugee status, or a credible or reasonable fear of persecution.

Guidance 6, J.A. 358. *A-B-* likewise states that "[g]enerally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify for asylum," and "[a]ccordingly, few such claims would satisfy the legal standard to determine whether an alien has a credible fear of persecution." 27 I. & N. Dec. at 320, n.1. Challenging these statements, the asylum seekers argue that they "establish[] a rule generally rejecting credible fear claims pertaining to domestic and gang violence" and thus violate the INA. Appellees' Br. 14. The government responds that the asylum seekers misread *A-B-*, which, according to the government, simply "remarked" "that asylum claims based on gang and domestic violence [have] historically foundered on the requirements for particular social group, nexus, and persecution." Appellants' Br. 17, 56.

The problem with the government's argument is that both *A-B-* and the Guidance use the phrase "will not," rather than "have not," thus suggesting that the statements represent a new rule. That said, both statements also use the phrase "in general," thus suggesting that asylum claims based on domestic and/or gang violence might, depending on the circumstances of the case, qualify for asylum. Indeed, at oral argument, government counsel assured us that there is no general rule

against such claims, calling it "crystal clear" that "none of these groups are categorically barred." Oral Arg. Rec. 24:03–07. "[T]he only general rule that *Matter of A-B-* articulates," counsel explained, is that "[asylum officers] have to go through the steps" for analyzing particular-social-group claims. *Id.* at 25:20–25. This explanation is perfectly consistent with the Guidance's instruction to asylum officers, explained above, that claims be analyzed on a case-by-case basis.

The asylum seekers argue that "an allowance for limited exceptions does not mean no rule exists." Appellees' Br. 55. In support, they cite *McLouth Steel Product Corp. v. Thomas*, 838 F.2d 1317 (D.C. Cir. 1988), in which we found that an EPA model used to determine contamination levels constituted a "rule" within the meaning of APA section 553. *Id.* at 1319. As the asylum seekers point out, in that case we rejected EPA's argument that its "discretion to deviate" from the model transformed it into a nonbinding policy statement. *Id.* at 1320. Critical to our ruling, however, the language EPA used to announce the model "strongly suggested" that the agency intended to treat it as a "binding norm" and EPA's "later conduct"—namely, treating the model as "conclusively disposing of certain issues"—"confirm[ed] [the model's] binding character." *Id.* at 1320, 1321. Here, by contrast, the challenged statements are qualified by the words "general" and "generally." And, as explained above, other parts of both *A-B-* and the Guidance make clear that asylum officers must "analyze each case on its own merits in the context of the society where the claim arises," Guidance 3, J.A. 355. In other words, the record in this case does not support the asylum seekers' argument that USCIS and the Attorney General have erected a rule against asylum claims involving allegations of domestic and/or gang violence.

**IV.**

This brings us, finally, to the government's challenge to the district court's remedy. The district court declared all four policies unlawful, vacated them, and permanently enjoined application of the policies in credible-fear proceedings. It also ordered the government to (1) "provide written guidance or instructions to all asylum officers and immigration judges . . . communicating that the [vacated policies] shall not be applied to any . . . credible fear proceedings," and (2) provide new credible-fear interviews to the twelve asylum seekers who brought this case. Order at 3, *Grace*, No. 18-cv-1853 (D.D.C. June 3, 2019). The government does not challenge the latter requirement—indeed, the credible-fear interviews have already occurred. Instead, the government objects to the portions of the district court's order enjoining the challenged credible-fear policies. According to the government, the injunction runs afoul of 8 U.S.C. § 1252, which the government believes withdraws district-court authority to issue a "prospective injunction mandating or barring particular interpretations of section 1158 in future individual credible-fear determinations." Appellants' Br. 34.

In support, the government first points to section 1252(f)(1), which provides:

> [N]o court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of [8 U.S.C. §§ 1221–31], . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1). This section, however, refers only to "the operation of the provisions"—i.e., the statutory provisions

themselves, and thus places no restriction on the district court's authority to enjoin *agency action* found to be unlawful. Indeed, the Supreme Court has twice noted that section 1252(f) "prohibits federal courts from granting classwide injunctive relief against the operation *of §§ 1221–1231*"; in neither case did it even hint that the "operation of the provisions" refers to anything other than the statute itself. *Reno v. American-Arab Anti–Discrimination Committee*, 525 U.S. 471, 481–482 (1999) (emphasis added); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 851 (2018) (quoting *Reno*, 525 U.S. at 481, and noting, without questioning, the Ninth Circuit's conclusion that section 1252(f) had no effect on its authority to enjoin violations or misapplications of the immigration-detention statutes).

The government also relies on section 1252(e)(1)(A), which provides that "no court may . . . enter declaratory, injunctive, or other equitable relief in an action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title except as specifically authorized in a subsequent paragraph of this subsection." 8 U.S.C. § 1252(e)(1)(A). As the plain language of this provision makes clear, it applies to "action[s] pertaining to an order to exclude an alien in accordance with section 1225(b)(1)," not to the kind of challenge we face here, namely, a "[c]hallenge[] on [the] validity of the [expedited-removal] system," *id.* § 1252(e)(3). As explained above, although the asylum seekers were issued expedited-removal orders, nothing about adjudicating their APA claims required the district court to examine those orders or the underlying credible-fear determinations.

This reading of section 1252(e)(1)(A) is confirmed by section 1252(e)(3). The latter provision does not, in the words of section 1252(e)(1)(A), "specifically authorize[]" any relief. Accordingly, were the government correct that section

1252(e)(1)(A) applies to this case, then Congress would have expressly authorized the district court to review expedited-removal policies yet simultaneously prohibited it from issuing any remedies. The government insists that section 1252(e)(3) does "specifically authorize[]" relief, citing in support the portion of that section stating that "[j]udicial review is available . . . but shall be limited to *determinations*," *id.* § 1252(e)(3)(A) (emphasis added). According to the government, that word means "declaratory" or "set aside" relief that "prevent[s] implementation of the challenged policies as to [these] Plaintiffs," but not "system-wide injunction[s]." Reply Br. 9–10 (internal quotation marks omitted). "Determination," however, denotes a decision, not a remedy. *See* Webster's Third New International Dictionary, Unabridged (online ed. 2020) (defining "determination" as "the settling and ending of a controversy especially by judicial decision"); Black's Law Dictionary (11th ed. 2019) (defining "determination" as "[t]he act of deciding something officially"). Indeed, throughout section 1252, Congress used "determination" in connection with decisions, referring, for example, to "the determination made under section 1225(b)(1)(B)," 8 U.S.C. § 1252(a)(2)(A)(iii), and "a determination made by a trier of fact," *id.* § 1252(b)(4).

Further confirming that the government is mistaken about the meaning of "determination," subsection (e)(2), mirroring subsection (e)(3), provides that "[j]udicial review" of expedited-removal orders "is available in habeas corpus proceedings, but shall be *limited to determinations of* . . . whether the petitioner is an alien," "whether the petitioner was ordered removed under [section 1225(b)(1)]," and "whether the petitioner can prove" lawful permanent residence or refugee or asylee status. *Id.* § 1252(e)(2) (emphasis added). Subsection (e)(4), in turn, specifies the relief available in such cases, namely, "a hearing in accordance with

section 1229a." *Id.* § 1252(e)(4)(B). The contrast between subsections (e)(2) and (e)(4) makes clear that Congress used the phrase "limited to determinations" in the former to refer to the scope of judicial review, not the relief available. Applying the "standard principle of statutory construction . . . that identical words and phrases within the same statute should normally be given the same meaning," *Powerex Corp. v. Reliant Energy Services, Inc.*, 551 U.S. 224, 232 (2007), we conclude that the phrase "limited to determinations" in subsection (e)(3) likewise refers to the scope of judicial review.

In sum, neither section 1252(f)(1) nor section 1252(e)(1) prohibited the district court from issuing an injunction. That said, unlike the district court, which in addition to finding the condoned-or-completely-helpless standard and choice-of-law policy arbitrary and capricious, enjoined them as contrary to law, we have not reached the latter issue. Instead, our decision rests on the agency's failure to satisfy the APA's "requirement of reasoned decisionmaking." *Fogo De Chao (Holdings) Inc. v. DHS*, 769 F.3d 1127, 1141 (D.C. Cir. 2014). Accordingly, nothing in this opinion necessarily precludes USCIS or the Attorney General from attempting to "remedy[] deficiencies in [their] explanation[s]" for these challenged policies and reissuing them. *Shays v. Federal Election Commission*, 414 F.3d 76, 112 (D.C. Cir. 2005). Should that occur, and should the new policies be challenged, the "contrary to law" question will be squarely before the court.

## V.

During the course of this appeal, it has come to our attention—though, regrettably, not through any effort of the parties—that the Departments of Justice and Homeland Security, acting pursuant to a Centers for Disease Control order, have severely circumscribed newly-arrived aliens'

ability to seek asylum. *See* Notice of Order Under Sections 362 and 365 of the Public Health Services Act Suspending Introduction of Certain Persons From Countries Where A Communicable Disease Exists, 85 Fed. Reg. 17,060, 17,061 (Mar. 26, 2020) (suspending, with limited exceptions, the admission of noncitizens traveling from Mexico and Canada). We have also learned that the two Departments, citing *A-B-*, have jointly proposed new regulations that would, among other things, "provide clear parameters for evaluating cognizable 'particular social groups.'" Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 36,264, 36,278, 36,279 (proposed June 15, 2020). Our obligation, however, is to resolve the issues before us on the record the parties have presented. Having done just that, we reverse the district court's grant of summary judgment with respect to the circularity rule and the statements regarding domestic- and gang-violence claims, vacate the injunction insofar as it pertains to those issues, and remand to the district court for further proceedings consistent with this opinion. In all other respects, we affirm.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, dissenting: The Congress created the expedited removal system to ensure the swift removal of aliens unquestionably inadmissible into the United States. *See Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1354 (D.C. Cir. 2000); *see also DHS v. Thuraissigiam*, No. 19-161, 2020 WL 3454809, at *1 (U.S. June 25, 2020) ("[W]hen Congress enacted the [expedited removal system], it crafted a system for weeding out patently meritless claims and expeditiously removing the aliens making such claims from the country."). Accordingly, it sharply circumscribed the availability of judicial review related to expedited removal, *see generally* 8 U.S.C. § 1252(a)(2)(A), providing only a narrow path for challenges to the expedited removal system in the United States District Court for the District of Columbia, *see id.* § 1252(e)(3), and for limited habeas review in all federal district courts, *see id.* § 1252(e)(2). Moreover, the Congress expressly forbade any court from reviewing "credible fear determinations" or providing equitable relief not specifically authorized in the same subsection. *See id.* §§ 1252(a)(2)(A)(iii), (e)(1)(A).

Despite these constraints, the district court used section 1252(e)(3) to abrogate individual credible fear determinations and issue a sweeping universal injunction purporting to prevent the immigration authorities from applying the United States Attorney General's interpretation of the law. We now reverse the district court's interpretation of the expedited removal statute in all respects and vacate much of its order. In the meantime, however, asylum officers have been forced to make tens of thousands of credible fear determinations without the benefit of the United States Attorney General's legal views or the guidance of the United States Department of Homeland Security (DHS). The consequence is that thousands of aliens have been detained for full removal proceedings and released into the United States, despite there being little doubt that they are not entitled to asylum.

In short, the district court's actions represent precisely the type of judicial meddling in removal decisions the Congress sought to prevent when it created the expedited removal system. Rather than halt the district court's overreach, my colleagues sanction it and embark on a new experiment in judicial interference with the immigration system—vacating the Attorney General's interpretation of the immigration statutes pursuant to section 1252(e)(3). Accordingly, I respectfully dissent.

## I.

Setting out the relevant statutory and procedural background.

## A.

An alien who is "physically present" or "arrives" in the United States may seek asylum. 8 U.S.C. § 1158(a)(1). To qualify, an alien must be a "refugee." *Id*. § 1158(b)(1)(A). With certain exceptions inapplicable here, a "refugee" is an individual "who is outside any country of such person's nationality . . . who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *See* 8 U.S.C. § 1101(a)(42)(A).

Typically, an alien may pursue two paths in seeking asylum. Using the first path, he must submit an application under 8 U.S.C. § 1158. An application must be made within one year of the alien's arrival in the United States (unless certain exemptions apply). *See id*. § 1158(a)(1), (a)(2)(B). Once an alien applies for asylum, he is interviewed by an asylum officer. *See* 8 C.F.R. 208.9. If the asylum officer

decides not to grant an application and the applicant otherwise has a valid status, the officer simply denies the application. *See id*. § 208.14(c)(2). There is no avenue for appeal from such a denial. On the other hand, if the asylum officer denies the application and it appears that the applicant is removable, the asylum officer must place the applicant in removal proceedings in immigration court. *See id.* § 208.14(c)(1). Using the second path, after the applicant is placed in removal proceedings (either following referral by the asylum officer or after DHS initiates removal proceedings on its own), he may raise his asylum request as a defense to removal. *See id*. § 1208.14(a), (c). The immigration court then adjudicates the alien's claim in an adversarial proceeding, *see generally* 8 U.S.C. § 1229a, from which both the government and the alien may appeal to the Board of Immigration Appeals (BIA), *see* 8 C.F.R. § 1003.1(b). The Attorney General, in his discretion, may also certify a decision for his review. *See id*. § 1003.1(h). After an alien exhausts the administrative process, including any review by the Attorney General, a final order of removal issues. The alien may then petition for review in the appropriate court of appeals. *See* 8 U.S.C. § 1252(a)(1), (a)(5), (b), (d).

The Attorney General and the DHS Secretary retain ultimate authority to grant or deny asylum. *See id.* §§ 1103, 1158. Moreover, the Attorney General may adopt policies and issue precedential decisions that are binding on immigration judges and asylum officers. *See id.* § 1103(a)(1) ("[D]etermination[s] and ruling[s] by the Attorney General with respect to all questions of law shall be controlling."). The Attorney General has delegated authority to the BIA to issue precedential asylum decisions. 8 C.F.R. § 1003.1(d)(1), (h).

4

**B.**

There is also a third, irregular, path by which an alien can seek asylum. In response to a surge in the level of illegal immigration and asylum applications during the mid-1990s, the Congress enacted the provisions now codified at 8 U.S.C. § 1225(b)(1) in order to "expedite the removal from the United States of aliens who indisputably have no authorization to be admitted . . . ." H.R. Rep. No. 104-828, at 209 (1996) (Conf. Rep.); s*ee also Thuraissigiam*, No. 19-161, 2020 WL 3454809, at *1 ("It was Congress's judgment that detaining all asylum seekers until the full-blown removal process is completed would place an unacceptable burden on our immigration system and that releasing them would present an undue risk that they would fail to appear for removal proceedings."). The Congress mandated that "[i]f an immigration officer determines that an alien" who is "arriving in the United States" or otherwise designated by the Attorney General is inadmissible because he lacks immigration papers or misrepresents facts related to his eligibility for admission, the alien is "order[ed] . . . removed from the United States without further hearing." [1] *See* 8 U.S.C. § 1225(b)(1)(A)(i). The Congress included a procedure for an alien with a non-

---

[1] Originally the Attorney General (now the DHS Secretary) was authorized in his "sole and unreviewable discretion" to so designate "any or all aliens" so long as they "have not been admitted or paroled into the United States" and cannot show that they have been "physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." *See id.* § 1225(b)(1)(A)(iii). The DHS Secretary exercised his discretion to require the expedited removal of all aliens whose removal is statutorily required. *See* Designating Aliens for Expedited Removal, 84 Fed. Reg. 35,409, 35,409–14 (July 23, 2019).

frivolous asylum claim to pursue it. *See id.* § 1225(b)(1)(B). If an alien who is otherwise immediately removable expresses an intent to apply for asylum based on, *inter alia*, a "fear of persecution," he is interviewed by an asylum officer. *Id.* § 1225(b)(1)(A)(ii). The asylum officer must determine whether the alien has a "credible fear of persecution," defined as "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under [section § 1158]." *Id.* § 1225(b)(1)(B)(v). If the asylum officer finds that the alien has a "credible fear of persecution," the alien follows the standard removal process before an immigration judge. *Id.* § 1225(b)(1)(B)(ii); *see also id.* § 1229a (setting out procedures for standard removal proceedings). If, on the other hand, the asylum officer finds that an alien does not have a credible fear of persecution, the alien may seek review by an immigration judge. *Id.* § 1225(b)(1)(B)(iii). If the immigration judge affirms the asylum officer's determination, the alien must be immediately removed. [2] *Id.* The Congress has expressly precluded further administrative or judicial review of a negative credible fear determination. *See id.* §§ 1225(b)(1)(B)(iii)(I); 1252(a)(2)(A)(iii).

Critical to this case, the Congress also set out in 8 U.S.C. § 1252(a)(2) specific "[m]atters *not* subject to judicial review"

---

[2] The DHS Secretary must provide for review of a removal order issued to "an alien who claims under oath, or as permitted under penalty of perjury under section 1746 of title 28, after having been warned of the penalties for falsely making such claim under such conditions, to have been lawfully admitted for permanent residence, to have been admitted as a refugee under section 1157 of this title, or to have been granted asylum under section 1158 of this title." *See* 8 U.S.C. § 1225(b)(1)(C).

(emphasis added). It gave special attention to expedited removal in section 1252(a)(2)(A) as follows:

> Notwithstanding any other provision of law . . . no court shall have jurisdiction to review—
>
>> (i) except as provided in subsection (e), any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1) of this title,
>>
>> (ii) except as provided in subsection (e), a decision by the Attorney General to invoke the provisions of such section,
>>
>> (iii) the application of such section to individual aliens, including the determination made under section 1225(b)(1)(B) of this title, or
>>
>> (iv) except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1) of this title.

*Id*. § 1252(a)(2)(A). In another provision, however, the Congress allowed for swift resolution of any legal challenge to the new system. Section 1252(e)(3) authorizes the United States District Court for the District of Columbia to review "determinations under 1225(b) . . . and its implementation," *id*. § 1252(e)(3)(A)(i), but limits judicial review to "whether [section 1225(b)], or any regulation issued to implement such

section, is constitutional" and "whether such a regulation, or written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law," *id*. § 1252(e)(3)(A)(ii). The Congress required any action brought under section 1252(e)(3) to "be filed no later than 60 days after the challenged section, regulation, directive, guideline, or procedure . . . is first implemented," *id*. § 1252(e)(3)(B), and specified "the duty of the District Court, the Court of Appeals, and the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any case considered under this paragraph,"[3] *id*. § 1252(e)(3)(D). The Congress also limited the remedies available to the district court in section 1252(e) proceedings. *See id*. § 1252(e)(1)(A) (providing that "declaratory, injunctive, or other equitable relief" must be specifically authorized therein).

## C.

In *Matter of A-B-*, issued two months before this case began, the Attorney General exercised his authority to issue a precedential decision. *See* 27 I. & N. Dec. 316 (2018). The decision began with a DHS formal proceeding to remove an alien under section 1229a. The alien claimed asylum as a defense to removal, arguing that she was a "refugee" because she was abused by her husband based on her being one of a group of "El Salvadoran women who are unable to leave their domestic relationships where they have children in common."

---

[3] The Congress also provided for habeas review in all federal district courts. *See* § 1252(e)(3), (4), (5); *see also Thuraissigiam*, No. 19-161, 2020 WL 3454809, at *6–9; *Castro v. DHS*, 835 F.3d 422, 427 (3d Cir. 2016).

*Id*. at 321. On appeal, the BIA held that she qualified for asylum.[4] *Id*. The Attorney General referred the BIA's decision to himself and reversed in a precedential decision rendered under 8 U.S.C. § 1103.

Construing the definition of "refugee" in 8 U.S.C. § 1101(a)(42)(A), the Attorney General determined that the BIA erred in finding that the alien was persecuted based on her membership in a particular social group. *Id*. at 320. He reasoned that "El Salvadoran women who are unable to leave their domestic relationships where they have children in common" is not a cognizable "particular social group" because, among other reasons, "[t]o be cognizable, a particular social group must 'exist independently' of the harm asserted in an application for asylum or statutory withholding of removal." *Id*. at 334. He further held that A-B- was not "persecuted" because she had not shown that the El Salvadoran government was "unwilling or unable" to protect her. *Id*. at 344. The Attorney General noted that:

> Generally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify for asylum. While I do not decide that violence inflicted by non-governmental actors may never serve as the basis for an asylum or withholding application based on membership in a particular social group, in practice such claims are unlikely to satisfy the statutory grounds for proving group persecution that the government is unable or unwilling to address.

---

[4] The alien appealed to the BIA after having been ordered removed by an immigration judge. *See* 8 C.F.R. § 1003.1(b).

*Id*. at 320. In a footnote, he also noted that "[a]ccordingly, few such claims would satisfy the legal standard to determine whether an alien has a credible fear of persecution." *Id*. at 320, n.1.

Subsequently, the United States Customs and Immigration Service [5] (USCIS) issued a "Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with *Matter of A-B-*" (Guidance). The Guidance explained the implications of *Matter of A-B-* for asylum decisions made by USCIS personnel and instructed asylum officers to apply the law of the federal circuit in which an asylum interview takes place in processing an asylum claim. *See* USCIS, Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with *Matter of A-B-* 8–9, PM-602-0162 (July 11, 2018).

**D.**

The plaintiffs are twelve nationals of various Central American countries who were apprehended after illegally crossing the United States border with Mexico. USCIS placed each alien in an expedited removal proceeding pursuant to section 1225(b)(1). Because all of the plaintiffs expressed a "fear of persecution," each had a credible fear interview pursuant to section 1225(b)(1)(A). Asylum officers determined that none of the twelve had a credible fear of persecution and an immigration judge agreed. All were ordered removed.

The plaintiffs then filed suit in district court against DHS, the Attorney General, USCIS and the Executive Office of Immigration Review, using section 1252(e)(3) as their jurisdictional hook. They challenged the validity of both

---

[5] As part of DHS, *see* 6 U.S.C. § 271, USCIS administers much of the removal system.

*Matter of A-B-* and the Guidance, alleging that they would have received positive credible fear determinations had *Matter of A-B-* and the Guidance not been applied to them. The plaintiffs asked the district court to vacate *Matter of A-B-* and the Guidance, enjoin the defendants from applying *Matter of A-B-* and the Guidance, vacate their removal orders and order DHS to grant each plaintiff a new credible fear determination. They also asked the district court to allow those plaintiffs who had been removed be paroled into the United States instead.

The district court granted the plaintiffs' summary judgment motion. *See Grace v. Whitaker*, 344 F. Supp. 3d 96, 146 (D.D.C. 2018). It held that *Matter of A-B-* and the Guidance were policies "issued by or under the authority of the Attorney General to implement" section 1225(b) and therefore it had jurisdiction to consider whether *Matter of A-B-* and the Guidance contravened the Immigration and Nationality Act (INA) and the Administrative Procedure Act (APA) pursuant to 8 U.S.C. § 1252(e)(3). *Id*. at 117. It declared that both *Matter of A-B-* and the Guidance violated both the APA and "the immigration laws insofar as those policies are applied in credible fear proceedings," vacated *Matter of A-B-* and the Guidance and permanently enjoined "defendants and their agents from apply[ing *Matter of A-B-* and the Guidance] with respect to credible fear determinations, credible fear interviews, or credible fear review hearings." *Order* at 2–3, ECF No. 105. It also vacated each individual plaintiff's credible fear determination and removal order and ordered the defendants—if they sought to remove any of the plaintiffs without a full removal hearing—to "provid[e] each of them a new credible fear process consistent with the Court's Memorandum Opinion and free from" the policies contained in *Matter of A-B-* and the Guidance. *Id*. at 3. As for those plaintiffs who had been removed, it ordered the defendants to return them to the United States. *Id*. The district court denied the

defendants' requested stay pending appeal. *See Grace v. Whitaker*, No. 18-1853, 2019 WL 329572, at \*5 (D.D.C. Jan. 25, 2019). The defendants timely appealed, *see* FED. R. APP. P. 4(A)(1)(B), and our jurisdiction arises from 28 U.S.C. § 1291.

## II.

I believe the district court was without jurisdiction to review the plaintiffs' claims, as is made plain by three separate statutory provisions. *See* 8 U.S.C. §§ 1252(a)(2)(A)(i) (barring district court from "entertain[ing] any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1)"); 1252(a)(2)(A)(iii) (barring judicial review of "the determination made under section 1225(b)(1)(B)"); 1252(a)(5) ("[A] petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter, except as provided in [section 1252(e)]"). Nevertheless, my colleagues conclude that 8 U.S.C. § 1252(e)(3) authorizes the plaintiffs to challenge their credible fear determinations, *Matter of A-B-* and the Guidance. I disagree—section 1252(e)(3) does not vest jurisdiction in the district court and, even assuming it does, section 1252(a)(2)(A)(iii) constitutes an independent bar to its review of the plaintiffs' claims.

## A.

First, I believe the plaintiffs' suit is barred by section 1252(a)(2)(A)(iii). That provision commands that "no court shall have jurisdiction to review . . . the application of [section 1225(b)(1)] to individual aliens, including the determination made under section 1225(b)(1)(B) of this title." Unlike the other jurisdictional bars contained in section 1252(a)(2)(A), section 1252(a)(2)(A)(iii) conspicuously does *not* include an

exception for litigation brought pursuant to section 1252(e). If the plaintiffs' suit requires "review [of] . . . the determination made under section 1225(b)(1)(B)," that is, the credible fear determination, the district court is without jurisdiction to entertain it. *See Thuraissigiam*, No. 19-161, 2020 WL 3454809, at *7 (quoting 8 U.S.C. § 1252(a)(2)(A)(iii)) ("[C]ourts may not review 'the determination' that an alien lacks a credible fear of persecution.").

I have no doubt that their suit does require such review. The plaintiffs contend that they do not seek "review" of any credible fear determination because they mount instead a "systemic challenge" to *Matter of A-B-* and the Guidance. Appellee's Br. 23. But the plaintiffs asked the district court to accept that "as a result of [*Matter of A-B-* and the Guidance], the immigration authorities summarily rejected [their] asylum claims and ordered them removed," to declare *Matter of A-B-* and the Guidance "contrary to law," "order that [their] expedited removal orders be vacated and that they be provided with a new credible fear process." *Complaint* at 3, 5, ECF No. 3. In other words, the plaintiffs assert standard APA arguments and ask for standard APA remedies regarding their individual credible fear determinations. *See* 5 U.S.C. § 706 ("To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."). Their allegations and requested relief require "review" of a determination as "review" is ordinarily used. *See* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "review" as "[c]onsideration, inspection, or reexamination of a subject or thing."). Moreover, we have held that an APA challenge to the DHS Secretary's discretionary decision constitutes "review" of that decision within the meaning of section 1252(a)(2)(B)(ii)'s jurisdictional bar. *See Zhu v. Gonzales*, 411 F.3d 292, 294–95

(D.C. Cir. 2005); *see also Poursina v. USCIS*, 936 F.3d 868 (9th Cir. 2019) (same); *Bernardo ex rel. M & K Eng's, Inc. v. Johnson*, 814 F.3d 481, 484–85 (1st Cir. 2016) (same); *cf. INS v. St. Cyr*, 121 S. Ct. 2271, 2285–86 (2001) (statutes that "preclude[] judicial review" historically construed to bar APA suits).[6] And, interpreting the same provision, several sister circuits have held that a suit purporting to challenge policies that guide DHS in making its ultimate decision seeks "review" of that decision. *See Bakran v. DHS*, 894 F.3d 557 (3d Cir. 2018); *Gebhardt v. Nielsen*, 879 F.3d 980, 987 (9th Cir. 2018); *Privett v. DHS*, 865 F.3d 375, 380–81 (6th Cir. 2017); *Bremer v. Johnson*, 834 F.3d 925, 929–32 (8th Cir. 2016); *Lee v. USCIS*, 592 F.3d 612, 620 (4th Cir. 2010); *Walid El-Baz Abdelwahab v. Frazier*, 578 F.3d 817, 821 (8th Cir. 2009); *but cf. Musunuru v. Lynch*, 831 F.3d 880, 887–88 (7th Cir. 2016) (section 1252(a)(2)(B)(ii) does not prevent court from considering whether immigration authorities complied with procedure in making discretionary decision); *Mantena v. Johnson*, 809 F.3d 721, 728 (2d Cir. 2015) (same); *Kurapati v.*

---

[6] The majority discounts this precedent because it "mention[s] neither credible-fear interviews nor expedited removal." Maj. Op. 16. My colleagues miss the point of my discussion. I express no view about the relationship between section 1252(a)(2)(B) and section 1252(a)(2)(A). In discussing section 1252(a)(2)(B), my point is that the consistent understanding of "review" adopted by courts in interpreting section 1252 necessarily means that the plaintiffs ask for "review" of their credible fear determinations. The fact that neither *Zhu* nor section 1252(a)(2)(B) involves expedited removal does not rebut that point. Moreover, "read[ing] section 1252(a)(2)(A)(iii)'s jurisdictional bar in tandem with section 1252(e)(3)," Maj. Op. 16, which we must do of course, *see Negusie v. Holder*, 555 U.S. 511, 519 (2009) ("[W]e look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.") (internal quotation marks and citations omitted), does not mean ignoring section 1252(a)(2)(A)(iii)'s plain text.

*U.S. Bureau of Citizenship and Immigration Servs*., 775 F.3d 1255, 1262 (11th Cir. 2014) (same). That the plaintiffs characterize their suit as a challenge to *Matter of A-B-* and the Guidance should not prevent us from recognizing what, in reality, it is—an APA challenge to their respective credible fear determinations. It follows that they seek judicial review of "the determination made under section 1225(b)(1)(B)," review that the Congress has expressly barred.

The language of section 1225(b)(1)(B) itself, enacted simultaneously with section 1252, confirms my understanding of section 1252(a)(2)(A)(iii), that is, that it bars any attempt to seek judicial review of a negative credible fear determination. Section 1225(b)(1)(B) provides that "[s]ubject to [review by an immigration judge], if the officer determines that an alien does not have a credible fear of persecution, the officer shall order the alien removed from the United States *without further hearing or review*." 8 U.S.C. § 1225(b)(1)(B)(iii)(I) (emphasis added). In other words, the Congress made clear in section 1225(b)(1)(B) that there is to be no judicial review of negative credible fear determinations, whether framed as "systemic" challenges or otherwise.

Nevertheless, the plaintiffs argue that the first clause of section 1252(a)(2)(A)(iii) ("no court shall have jurisdiction to review . . . the application of such section to individual aliens") requires that we read the second clause of section 1252(a)(2)(A)(iii) ("including the determination made under section 1225(b)(1)(B) of this title") to bar review of credible fear determinations only to the extent that it prohibits a claimant to seek judicial review of whether an asylum officer correctly applied the law to the facts of the particular claimant's case. The plaintiffs mangle the plain text of the statute. The Congress made a point of specifically withholding jurisdiction to review "the determination made under section

1225(b)(1)(B)." *Id*. § 1252(a)(2)(A)(iii). Whatever the Congress intended by barring review of "the application of [section 1225(b)(1)] to individual aliens," it left no doubt that review of "the determination made under section 1225(b)(1)(B)" is beyond judicial review. *Id*. And although the use of "including" may suggest that the Congress viewed "review . . . [of] the determination made under section 1225(b)(1)(B)" as one instance of the more generally forbidden "review . . . [of] the application of [section 1225(b)(1)] to individual aliens," *id*., the obvious reading is that the Congress regarded credible fear determinations as inherently individualized. The Congress did not carve out an exception for a so-called "systemic" challenge as the plaintiffs contend.

The plaintiffs also argue that the most natural reading of section 1252(a)(2)(A)(iii) should be rejected because it would effectively prevent any individual from mounting a challenge pursuant to section 1252(e)(3). Appellee's Br. 23.[7] That claim is doubly flawed. First, section 1252(a)(2)(A)(iii) bars review of "the application of [section 1225(b)(1)] to individual aliens" and credible fear determinations only. Under our precedent, *see*

---

[7] The majority claims that "the government's view of section 1252(a)(2)(A)(iii) could leave no one able to challenge the policies at issue in this suit." Maj. Op. 14. That is incorrect. Section 1252(a)(2)(A)(iii) prevents only the plaintiff who has received a negative credible fear determination from challenging *Matter of A-B-* and the Guidance. As several sister circuits have recognized, however, an alternative avenue for judicial review of *Matter of A-B-* and the Guidance exists—the standard petition for review procedure. *See Gonzalez-Veliz v. Barr*, 938 F.3d 219, 233–36 (5th Cir. 2019). Moreover, although this issue is not before us, my reading of section 1252(a)(2)(A)(iii) does not rule out the possibility of a plaintiff's challenge to a policy before receiving a negative credible fear determination.

*Am. Immigration Lawyers Ass'n*, 199 F.3d at 1356–57 (upholding standing of two non-asylum seeking aliens subjected to expedited removal to challenge policies implementing section 1225(b)(1)), [8] an alien determined inadmissible and ordered removed pursuant to section 1225(b)(1)(A) can challenge a policy "issued by . . . the Attorney General to implement" section 1225(b)(1), 8 U.S.C. § 1252(e)(3)(A)(ii). Moreover, even if the plaintiffs are correct that reading section 1252(a)(2)(A)(iii) as its text demands would leave no plaintiff able to challenge a policy via section 1252(e)(3), that result can make no difference to our decision. We must apply the statute as the Congress enacted it. *See Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2169 (2015) ("Our job is to follow the text even if doing so will supposedly undercut a basic objective of the statute.") (internal quotation marks omitted).

**B.**

In addition, I do not believe that section 1252(e)(3) vested jurisdiction in the district court. Section 1252(e)(3)(A) authorizes the district court to review "determinations under [section 1225(b)] and its implementation" but restricts that jurisdiction to "determination[s] of . . . whether [any regulation issued to implement section 1225(b)] or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." Neither *Matter of A-B-* nor the Guidance construes section 1225(b). Instead, *Matter of A-B-* construes the definition of "refugee" contained

---

[8] Critically, the plaintiffs in *Am. Immigration Lawyers Ass'n* did not challenge a credible fear determination—they were individual non-asylum seekers and organizations seeking to vindicate aliens' rights in general. *See* 199 F.3d at 1356–57.

in 8 U.S.C. § 1101(a)(42)(a). 27 I. & N. Dec. at 325–26. That definition is connected to section 1225(b) circuitously—the definition of "refugee" contained in section 1101 is used to define eligibility for asylum in 8 U.S.C. § 1158. Section 1225(b)(1)(B)(v) in turn defines a "credible fear of persecution" as "a significant possibility . . . that the alien could establish eligibility for asylum under *section 1158 of this title*" (emphasis added). That *Matter of A-B-* construes only sections 1101 and 1158, not section 1225(b), means, in my reading, that the district court lacks jurisdiction to review both *Matter of A-B-* and the Guidance.

Section 1252(e)(3)(A)(ii) does not authorize judicial review of the Attorney General's interpretation of provisions other than section 1225(b), at least if his interpretation is included in an adjudicatory decision like *Matter of A-B-*. That becomes clear once the admittedly complex structure of section 1252 is understood. *See Negusie v. Holder*, 555 U.S. 511, 519 (2009) ("[W]e look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.") (internal quotation marks and citations omitted). Judicial review of issues of law in immigration proceedings, including those related to asylum, is ordinarily through a petition for review of a final removal order. *See generally* 8 U.S.C. § 1252(b); *see also id.* § 1252(a)(2)(D), (a)(5). But the Congress sought to bar judicial review in expedited removal proceedings and thus section 1252(a)(2)(A) expressly bars "judicial review" of various actions related to expedited removal, including removal orders. *See id.* § 1252(a)(2)(A)(i). Section 1252(a)(2)(A)(iv) contains one of four statutory barriers to judicial review. It provides that "[n]otwithstanding any other provision of law . . . no court shall have jurisdiction to review . . . (iv) except as provided in [section 1252(e)], procedures and policies adopted by the Attorney General to implement the provisions of section

1225(b)(1) of this title." The district court acknowledged that section 1252(a)(2)(A)(iv) would bar the plaintiffs' challenge to *Matter of A-B-* and the Guidance *unless* section 1252(e)(3) provides otherwise. *See Grace*, 344 F. Supp. 3d at 115. At the same time, however, it disregarded the language of section 1252(a)(2)(A)(iv), which closely resembles the jurisdiction-granting language of section 1252(e)(3)(A)(ii). *Compare id*. § 1252(a)(2)(A)(iv) ("Notwithstanding any other provision of law . . . no court shall have jurisdiction to review . . . (iv) except as provided in [section 1252(e)], procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1)") *with id*. § 1252(e)(3)(A)(ii) ("Judicial review of determinations under section 1225(b) . . . is available . . . but shall be limited to determinations of . . . whether . . . a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.").

These two provisions differ in some respects—section 1252(a)(2)(A)(iv) bars judicial review of "procedures and policies" and section 1252(e)(3)(A)(ii) applies to "written policy directive[s], written policy guideline[s], [and] written procedure[s]." A policy must be "adopted by the Attorney General" to be covered by section 1252(a)(2)(A)(iv) but may be "issued by or under the authority of the Attorney General" to come within section 1252(e)(3)(A)(ii). A policy must implement "section 1225(b)(1)" to oust judicial review per section 1252(a)(2)(A)(iv) but may implement section 1225(b) more broadly and nonetheless be covered by section 1252(e)(3)(A)(ii)'s grant. The overall effect, however, is that the two provisions mirror one another. What limited authority section 1252(e)(3)(A)(ii) grants to the United States District

Court for the District of Columbia, section 1252(a)(2)(A)(iv) withdraws from all other courts.

That structural feature of section 1252 means that section 1252(e)(3)(A)(ii) cannot grant the district court jurisdiction to consider the plaintiffs' claims. The majority reasons that *Matter of A-B-* constitutes a written policy "issued by or under the authority of the Attorney General to implement" section 1225(b) because it construes the asylum eligibility provisions of section 1158. Maj. Op. 18 (quoting 8 U.S.C. § 1252(e)(3)(A)(ii)) (*Matter of A-B-* is a policy "issued . . . to implement" section 1225(b) because "[t]he decision's overarching purpose . . . is to interpret section 1158[] . . . which Congress incorporated into section 1225(b) by defining 'credible fear of persecution' as 'a significant possibility . . . that the alien could establish eligibility for asylum under section 1158.'"). But if section 1252(e)(3)(A)(ii) grants our district court jurisdiction to review the Attorney General's precedential adjudication interpreting the asylum statutes, as the district court (and my colleagues) believe, it follows from the parallel language of sections 1252(e)(3)(A)(ii) and 1252(a)(2)(A)(iv) that the latter provision bars a court of appeals from reviewing any adjudicatory decision by the Attorney General or the BIA that touches on asylum, notwithstanding their authority to "review all questions of law and fact" included in a petition for review from such decision. *See id*. § 1252(b)(9). That reading of the judicial review provisions—limited as they are—cannot be correct. Plainly, the Congress did not intend the jurisdiction-stripping provisions of section 1252(a)(2)(A) to bar judicial review of every adjudicatory decision by the Attorney General applying the asylum statutes. Reading 1252(a)(2)(A)(iv) to do so is inconsistent with Supreme Court precedent and decisions of our sister circuits. *See Negusie*, 555 U.S. at 513–14 (review of BIA decision construing "refugee"); *Gonzalez-Veliz v. Barr*,

938 F.3d 219, 233–36 (5th Cir. 2019) (review of Attorney General's interpretation of "refugee" in *Matter of A-B-*). The majority's interpretation of section 1252(e)(3) suggests that every court that has assessed whether the Attorney General or the BIA correctly construed section 1158 or the section 1101 definition of "refugee" applied in section 1158 (not to mention the other statutes cross-referenced in section 1158) did so in contravention of the jurisdiction-stripping provisions of section 1252(a)(2)(A). In view of Supreme Court precedent and in line with other circuits, I have to conclude that *Matter of A-B-* is not a written policy "issued . . . to implement" section 1225(b) and, accordingly, section 1252(e)(3) does not clothe the district court with authority to review it.

In holding otherwise, the district court emphasized that *Matter of A-B-* cited section 1225(b)(1)(B) in a short footnote, presumably indicating to that court that *Matter of A-B-* construed section 1225(b). *Grace*, 344 F. Supp. 3d at 116. The footnote is attached to the Attorney General's statement that "[g]enerally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify asylum," *Matter of A-B-*, 27 I. & N. Dec. at 320, and notes simply that "[a]ccordingly, few such claims would satisfy the legal standard to determine whether an alien has a credible fear of persecution," *id*. at 320 n.1. At oral argument, the government counsel argued that the footnote "doesn't matter," Oral Arg. at 7:25, and the plaintiffs' counsel did not demur.

And for good reason. The footnote simply makes an unremarkable observation about non-governmental violence's limited basis to support a credible fear determination. It does not construe section 1225(b) and the determinations made in *Matter of A-B-* would have been the same without regard to section 1225(b). In other words, the footnote does not

transform *Matter of A-B-* into a written policy "issued . . . to implement" section 1225(b).

The majority responds that section 1252(a)(2)(A)(iv) "leaves open the possibility that some such 'procedures and policies' might be 'adopted by the Attorney General' to 'implement . . . section 1225(b)(1)' and also for other purposes" so that the "policies could simultaneously be challenged in the district court for the District of Columbia pursuant to section 1252(e)(3) and also through a petition for review of a BIA decision." Maj. Op. 19 (quoting 8 U.S.C. § 1252(a)(2)(A)(iv)). The plain language of the statute refutes that suggestion. The Congress was absolutely clear that if a "procedure[] [or] [polic[y]" is "adopted by the Attorney General" to "implement . . . section 1225(b)(1)," it is not subject to judicial review outside a section 1252(e) proceeding, regardless of any other purpose that policy might have. *See* 8 U.S.C. § 1252(a)(2)(A)(iv). The dual-track review procedure the majority envisions is a mirage.

My colleagues also suggest that a sister circuit agrees with their understanding of the interplay between sections 1252(a)(2)(A)(iv) and (e)(3). *See* Maj. Op. 20 (citing *Gonzalez-Veliz*, 933 F.3d at 228). They are again mistaken. The *Gonzalez-Veliz* panel did not discuss section 1252(a)(2)(A)(iv) at all. The comment quoted by the majority comes from the Fifth Circuit's consideration of the effect of our district court's *remedy* on its review of a different plaintiff's final removal order. That court came to the sensible conclusion that its review of *Matter of A-B-* and the Guidance was not affected by our district court's order because the order was, by its own terms, limited to credible fear proceedings. *See Gonzalez-Veliz*, 933 F.3d at 228 (D.C. district court order did not affect its review because district court "vacated [*Matter of*] *A-B-* and the guidance memorandum as they pertain to credible-fear claims

in expedited removal proceedings only"). At no point did the Fifth Circuit consider the merits of our district court's reading of section 1252(e)(3) or its implication, if any, for the Fifth Circuit. The fact that the Fifth Circuit did *not* agree with our district court's interpretation of the section 1252(e)(3) cannot be wheeled out as support for that interpretation. The Fifth Circuit decision, together with that of the First Circuit also cited by the majority, *see* Maj. Op. 20 (citing *De Pena-Paniagua v. Barr*, 957 F.3d 88, 93 (1st Cir. 2020)), simply serve to underline the fact that the majority's interpretation of section 1252(e)(3) is irreconcilable with the decisions of sister circuits.

I believe that the district court also lacked jurisdiction to review the Guidance, at least to the extent that it addresses the substantive asylum standard. The Guidance largely restates *Matter of A-B-*. It has no independent legal effect apart from *Matter of A-B-* and, like *Matter of A-B-*, the Guidance mentions credible fear determinations only in passing.[9] Because the Guidance adds nothing substantive to *Matter of A-B-* and *Matter of A-B-* is not a policy "issued . . . to implement" section 1225(b), it follows that neither is the Guidance.

In my view, section 1252(e)(3) does not permit judicial review of the plaintiffs' challenge to *Matter of A-B-* or to the Guidance and I would dismiss their complaint under Rule 12(b)(1).

---

[9] Because section 1252(a)(2)(A)(iii) independently bars the plaintiffs' suit, I leave aside the more difficult question whether the Guidance's instruction to asylum officers on the law they are to apply in credible fear interviews—the only part of the Guidance other than its reading of *Matter of A-B-* the plaintiffs challenge—itself qualifies as a "written policy . . . issued . . . to implement" section 1225(b).

Accordingly, I respectfully dissent.